UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DONALD WRIGHT SIGMUND, )<br>)<br>          **Plaintiff,** )<br>)<br>    v. )<br>)<br>STARWOOD URBAN INVESTMENT, *et al.*, )<br>)<br>          **Defendants.** )<br>_____) | Civil Action No. 03-1507 (ESH) |

**MEMORANDUM OPINION**

Plaintiff Donald Wright Sigmund sustained severe injuries on July 12, 2002, when a homemade pipe bomb exploded in his father's vehicle while it was parked in the garage beneath his father's office building at 5225 Wisconsin Avenue, Northwest in Washington, D.C. It is undisputed that the bomb was put there by his half brother, Prescott Sigmund, who has since pled guilty and been sentenced for that crime. Alleging negligence, negligent infliction of emotional distress and gross negligence, plaintiff brought this action against Starwood Urban Retail, VI, LLC ("Starwood"), the property owner; Cassidy & Pinkard Property Services, LLC and Cassidy & Pinkard, Inc. (collectively "Cassidy" or "C&P"), the property manager; Standard Parking Corporation, Standard Parking Corporation IL, and Standard Parking L.P. (collectively "Standard Parking"), the operators and supervisors of the parking garage; and APCOA, Inc. ("APCOA"), the entity allegedly responsible for the management and security of the garage.[1]

---

[1] Plaintiff originally initiated suit against only Starwood and his half brother. Subsequently plaintiff filed a separate suit arising out of the same incident against C&P, Standard Parking, APCOA, and AGW & Associates, Inc, the entity allegedly responsible for the maintenance and repair of the parking garage door. By order dated September 22, 2005, the Court consolidated these two actions. Defendant AGW was later dismissed from the case by stipulation of the parties dated January 23, 2006.

Defendants Starwood, Cassidy, Standard Parking, and APCOA have moved for summary judgment. As explained below, because plaintiff cannot meet the legal standard of a "heightened showing of foreseeability" that is applied when an injury is caused by the intervening criminal act of a third party, *see Novak v. Capital Mgmt. & Dev. Corp.*, 452 F.3d 902, 912 (D.C. Cir. 2006), defendants' motions for summary judgment will be granted.

## BACKGROUND

For some time prior to the bombing on July 12, 2002, plaintiff's half brother, Prescott Sigmund, planned to kill their father, Donald Sigmund. (Prescott Sigmund Dep. at 145-46.) According to his deposition testimony, Prescott[2] had fallen into debt after losing his job in December 2001, and he believed that he stood to inherit approximately $300,000 upon his father's death. (Prescott Sigmund Dep. at 75-80.) Prescott began to put his plan into action approximately six weeks before the bombing when on or about May 28, 2002, he used a fake driver's license that he had created on his home computer to purchase smokeless gunpowder from a shop in Silver Spring, Maryland under an assumed name. (*Id.* at 93-94; Standard Parking Facts ¶ 12.) Sometime thereafter, in June 2002, he purchased other bomb-making materials, including wires, piping, and model rocket fuses. (Standard Parking Facts ¶ 13.) Prescott told no one of his plan to murder his father. (C&P Facts ¶ 35.)

At the time, Donald Sigmund was president of Wolf & Cohen Life Insurance, Inc., which had its offices at 5225 Wisconsin Avenue, N.W., a multi-story commercial office building with shops and a restaurant on the ground level. (C&P Facts ¶¶ 4, 27.) Plaintiff was working for his father at Wolf & Cohen at the time of the bombing, and Prescott had also worked for the

---

[2]For the sake of clarity, the Court refers to Mr. Sigmund by his first name.

company in the past and was familiar with the office building.  (Starwood Amended Compl. ¶ 14; C&P Facts ¶ 42.)  Donald Sigmund owned a Chevrolet Blazer that he used "infrequently" and "usually" kept parked in the garage at 5225 Wisconsin.  (Prescott Sigmund Dep. at 51, 85-86; Pl. Facts ¶¶ 45, 46.)  Prescott possessed a set of keys to his father's Blazer.  (Standard Parking Facts ¶ 9.)  Late in the evening of July 10, 2002, Prescott drove his own car into the garage at 5225 Wisconsin, opened the Blazer with his keys, and spent approximately two hours assembling a pipe bomb inside the car using the materials he had previously acquired.  (C&P Facts ¶¶ 28, 41; Prescott Sigmund Dep. at 45-46.)  Prescott then closed up the Blazer and left the garage in his own car.  (Prescott Sigmund Dep. at 115.)  No one used the Blazer until two days later, when plaintiff, sent on an errand by his father, stepped into the car, thereby detonating the bomb.  (C&P Facts ¶ 29.)  Plaintiff suffered devastating permanent injuries in the resulting explosion.  (Prescott Sigmund Stmt. of Offenses at 8.)  Shortly after the bombing, Prescott fled to Missoula, Montana, where he lived under an assumed name for several months.  (*Id.* at 16.)  He was apprehended by police after a segment about the bombing aired on the television program "America's Most Wanted."  (*Id.*)  He pled guilty to a number of criminal charges and is currently serving a thirty-two year sentence at a federal prison in West Virginia.  (Prescott Sigmund Dep. at 61-62.)

Ordinarily the garage at 5225 Wisconsin was secured by an overhead rolling-steel garage door.  (Crouch Dep. at 24.)  Building tenants could access the garage at any time using an electronic key card, and members of the public, including customers of the restaurant located on the first floor of the building, could also park in the garage for a fee during its hours of operation from 7:00 a.m. until 10:00 p.m.  (Pl. Facts ¶ 19; C&P Facts ¶ 5; Collins Dep. at 135.)  Parking

attendants staffed the garage and monitored the entrance until 10:00 or 11:00 p.m. each evening. (Prescott Sigmund Dep. at 109.) The record also indicates that after-hours public access to the garage was available through the building's restaurant, which was open each night until approximately midnight. (C&P Facts ¶ 6; Collins Dep. at 42; Prescott Sigmund Stmt. of Offenses at 14.) One could walk into the restaurant from the street, through the restaurant into the building's lobby, and then down an unsecured staircase unto the garage.[3] (Starwood Amended Compl. ¶ 24; *see* Collins Dep. at 42 ("[T]he standard building operating hours are roughly from six in the morning to seven in the evening, although one can enter through the restaurant. The restaurant is open late into the evening, and one can enter . . . readily through the restaurant into the lobby, then go to the parking garage, and that includes weekends as well.").)

For several weeks prior to the bombing the garage door at 5225 Wisconsin was broken and stuck in the up position, so that access through the garage door was unrestricted after the parking attendants left for the evening.[4] (Pl. Facts ¶ 36.) Prescott learned about the broken garage door on July 9 while visiting his father's office. (Prescott Sigmund Dep. at 43-44.) In his

---

[3]In fact, plaintiff's complaint against Starwood was premised on the theory that Prescott gained access to the garage through the door leading from the Bambulé restaurant into the lobby of the building, and then through the unlocked stairwell leading from the lobby into the parking garage. (*See* Starwood Amended Compl. ¶¶ 16, 18-19.) Though it is clear from his opposition to the instant motions that plaintiff now contends that Prescott entered the garage through the broken garage door, as his subsequent complaint against the other defendants alleges, he never sought to amend his complaint against Starwood to reflect the new factual theory. Given the Court's disposition of the foreseeability issue, the lack of amendment is of no consequence.

[4]The record indicates that when the parking attendants discovered the problem with the garage door, they reported it to the building manager, Cassidy, in a timely manner. (*See* Ortenzo Dep. at 194.) Cassidy contacted AGW about repairing the door on June 24, 2002, and AGW provided Cassidy with an estimate for the repairs that day. (Weik Dep. at 14,17.) AGW received authorization to begin repairs on July 10, 2002, and the repairs were made on July 11, 2002, the day before the explosion. (*Id.* at 20-21, 25.)

deposition, he testified that the broken door provided "the opportunity . . . [he] had been looking for" to carry out his plan. (*Id.* at 12.)  On the evening of July 10, Prescott arrived at 5225 Wisconsin after the parking attendants had left for the night and drove his car into the garage through the broken door, whereupon he proceeded to plant the bomb. (*Id.*)

Perhaps not surprisingly, there is no history of car bombings, homicides, or assaults with intent to kill on the premises of 5225 Wisconsin prior to July 12, 2002.  Plaintiff's evidence indicates that there were at least thirty-two crimes that occurred at the property that were reported to the D.C. police in the preceding five years, including "9 felonies, 4 crimes against persons, and 8 crimes involving parked autos."  (Ortenzo Aff. ¶ 44.)  Plaintiff's expert's report and the police reports in the record indicate that the four reported crimes against persons consisted of: (1) a robbery at gunpoint in the area behind the building; (2) an incident in which a disruptive customer kicked an employee of a retail store in the buttocks while being ejected from the property (classified by the police report as "assault with a deadly weapon"); (3) a simple assault involving an employee of Kinko's print shop pushing a customer in the chest with his finger after a verbal dispute; and (4) another simple assault involving an individual striking another individual in the back of his head with his own head.  (Ortenzo Report at 38-39; Pl. Ex. I [police reports].)  None of these incidents resulted in serious bodily injury.  (Starwood Facts ¶ 8.)  Based on police reports, it is undisputed that there were only four crimes -- three thefts and a broken car window -- reported to the police as having occurred in the parking garage in the six-and-a-half year period preceding the bombing (C&P Facts ¶ 23), and from the time that Cassidy assumed management in April 2001 until the time of the incident, there was one reported incident of a car theft in October 2001 and an unreported theft of a drop safe from the garage in

July 2001.  (C&P Facts ¶ 14, Pl. Facts ¶ 26.)  There were no crimes against persons reported at the building at all in 2001 or 2002.  (Ortenzo Report at 38-39; Pl. Ex. I.)  However, with respect to the five-block radius around the property, there were 503 documented crimes in the preceding two years, including twenty-eight assaults (ten being assaults with a deadly weapon and one being an aggravated assault).  (Ortenzo Aff. ¶ 51.)  Fifty-nine of these 503 crimes occurred in neighboring parking lots or garages.  (*Id.*)  There is no evidence in the record of any homicides, attempted homicides, or bombings in the surrounding five-block radius during that period.

Nor is there evidence in the record that any tenants complained to any of the defendants about inadequate security measures or suspicious intruders in the building in the year leading up to the bombing.  The deposition testimony of Patricia Williams, director of human resources at Wolf & Cohen, indicates that the garage door was originally installed by the previous building manager about five years prior to the date of her deposition in October 2004 at the request of the building's tenants "[b]ecause the garage was just wide open.  Anybody could just walk in and people did not feel safe."  (Williams Dep. at 41.)  She also testified, without specifying a particular time frame, that she "would see someone suspicious" at the building "maybe once every other month," and when this happened the people at Wolf & Cohen would inform the property manager.  (*Id.* at 48.)  However, plaintiff does not dispute that there were no complaints by tenants about security in the building or the garage from the time that Cassidy began managing the property in April 2001 until the time of the bombing, and that no tenant requested additional security in the building during that specific period.  (C&P Facts ¶¶ 8, 16; Pl. Facts ¶¶ 22, 28.)

Plaintiff argues that by failing to repair the garage door in a timely manner and by failing

to undertake other security measures, defendants did not maintain "the bare minimum of security required by the national standard of care" at 5225 Wisconsin, and that "[p]laintiff suffered catastrophic burn injuries directly due to the [d]efendants' negligence." (*See* Pl. Opp. at 1, 2, 27, 29.) Arguing that Prescott Sigmund's crimes were unforeseeable as a matter of law, that plaintiff has not identified with sufficient specificity a national standard of care that was breached, and that the negligence alleged by plaintiff was not the proximate cause of plaintiff's injuries, defendants Starwood, Cassidy, Standard Parking, and APCOA have moved for summary judgment. (*See* C&P Reply at 2, 5-7; Standard Parking Mot. at 11.)

## ANALYSIS

### I.  Standard of Review

Under Fed. R. Civ. P. 56, a motion for summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Only factual disputes that are capable of affecting the substantive outcome of the case under the governing law are deemed "material" and "genuine." *See id.* at 248; *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241-42 (D.C. Cir.1987). In considering a motion for summary judgment, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255; *see also Wash. Post Co. v. U.S. Dep't of Health & Human Servs.*, 865 F.2d 320, 325 (D.C. Cir. 1989). The non-moving party, however, must provide evidence that would permit a reasonable jury to find in its favor, *Laningham*, 813 F.2d at 1242, and its opposition must consist of more than mere unsupported allegations or denials and must be

supported by affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249-50.

## II.   Foreseeability of Prescott Sigmund's Criminal Act

Under District of Columbia negligence law, which controls in this diversity action, *see Smith v. Wash. Sheraton Corp.*, 135 F.3d 779, 782 (D.C. Cir. 1998), a defendant can be held liable for damages caused by the intervening acts of third parties only if those acts are reasonably foreseeable. *See Novak*, 452 F.3d at 911-12 ("As a general rule the proprietor of a place of public resort is subject to liability . . . for injuries inflicted by the acts of . . . third persons if the proprietor by the exercise of reasonable care could have known that such acts were being done or were about to be done . . . ." (quoting *Grasso v. Blue Bell Waffle Shop, Inc.*, 164 A.2d 475, 476 (D.C. 1960)) (internal quotation marks omitted)). Because the Court finds that plaintiff has failed, as a matter of law, to show that the bombing was reasonably foreseeable, and because his failure to make such a showing is dispositive of his claims against the moving parties, the Court will limit its analysis to that issue. *See Clement v. Peoples Drug Store, Inc.,* 634 A.2d 425, 427 (D.C. 1993); *Workman v. United Methodist Comm. on Relief*, 320 F.3d 259, 265 (D.C. Cir. 2003) (noting that recent D.C. cases have "tended to leapfrog directly to the foreseeability issue" in resolving questions of liability involving the intervening criminal acts of third parties).

"Because of the extraordinary nature of criminal conduct," when, as here, the harm is caused by the intervening criminal act of a third party, D.C. law "demands a more heightened showing of foreseeability than if [the intervening act] were merely negligent." *McKeathean v.*

*WMATA*, 588 A.2d 708, 716-17 (D.C. 1991) (internal quotation marks omitted); *see also Potts v. District of Columbia*, 697 A.2d 1249, 1252 (D.C. 1997).  Courts have described this heightened foreseeability requirement as "exacting," "demanding," "precise," and "restrictive."  *See Novak*, 452 F.3d at 912; *Potts*, 697 A.2d at 1252; *Lacy v. District of Columbia*, 424 A.2d 317, 323 (D.C. 1980); *Bell v. Colonial Parking, Inc.*, 807 F. Supp. 796, 797 (D.D.C. 1992).  Indeed, the D.C. Circuit has characterized the heightened foreseeability test as "a limited exception to the 'general rule of nonliability'" for negligence claims involving the intervening criminal acts of third parties.  *Workman*, 320 F.3d at 263 (quoting *Romero v. Nat'l Rifle Ass'n*, 749 F.2d 77, 79-80 (D.C. Cir. 1984)).  Thus, "[a] defendant may not be held liable for harm actually caused where the chain of events leading to the injury appears 'highly extraordinary in retrospect.'"  *Morgan v. District of Columbia*, 468 A.2d 1306, 1318 (D.C. 1983) (quoting *Lacy*, 424 A.2d at 320-21).

While a plaintiff is not required to show "previous occurrences of the particular type of harm" at issue, *District of Columbia v. Doe*, 524 A.2d 30, 33 (D.C. 1987), the D.C. Court of Appeals requires proof that the specific type of crime, not just crime in general, be particularly foreseeable at the relevant location.  *See Lacy*, 424 A.2d at 323; *see also Romero*, 749 F.2d at 79-80.  Accordingly, courts in this jurisdiction have consistently held that foreseeability cannot be predicated solely on "generic information" such as local crime rates or evidence of a "criminally active environment."  *Bailey v. District of Columbia*, 668 A.2d 817, 820 (D.C. 1995); *Clement*, 634 A.2d at 429; *see also Novak*, 452 F.3d at 912.

However, when there is a "special relationship" between the plaintiff and defendant that entails a duty of protection, including the relationship of a commercial landlord to a tenant, the heightened foreseeability requirement is lessened somewhat, and "can be met instead by a

combination of factors which give defendants an increased awareness of the danger of a particular criminal act." *Doe*, 524 A.2d at 33; *see also Novak*, 452 F.3d at 912; *Doe v. Dominion Bank*, 963 F.2d 1552, 1561 (D.C. Cir. 1992) ("[A] commercial landlord has a duty to take reasonable measures to safeguard tenants from foreseeable criminal conduct in the common areas of leased premises."). As the D.C. Circuit has noted, cases in this area "suggest a sliding scale: If the relationship between the parties strongly suggests a duty of protection, then specific evidence of foreseeability is less important, whereas if the relationship is not the type that entails a duty of protection, then the evidentiary hurdle is higher."[5] *Workman*, 320 F.3d at 264.

Invoking this sliding scale, plaintiff argues that since he was an employee or invitee of Wolf & Cohen, which was a tenant of 5225 Wisconsin, a "special relationship" existed between himself and the defendants, thereby lessening his burden to present specific evidence of foreseeability. (Pl. Opp. at 8-9, 13.) Plaintiff contends that the broken garage door -- constituting a "gaping hole in the building's security" -- made it more foreseeable that criminal activity would occur in the garage. (Pl. Opp. at 13, 14.) Citing *District of Columbia v. Doe*, 524 A.2d at 33, plaintiff also claims that the case law does not require evidence of "previous occurrences of the particular type of harm" at issue, but that it is sufficient that "a significant level of criminal activity including several incidents of serious crime on the property for at least several years and immediately prior to the crime on July 10, 2002 . . . provided reasonable notice of the high risk of future criminal acts on the property." (Pl. Opp. at 16, 18.) He further argues

---

[5] This sliding scale approach makes sense, for "[t]he question is not simply whether a criminal event is foreseeable, but whether a *duty* exists to take measures against it. Whether a *duty* exists is ultimately a question of fairness." *Doe*, 524 A.2d at 33 (quoting *Cook v. Safeway Stores*, 354 A.2d 507, 509-10 (D.C. 1976)) (emphasis in original).

that "[c]rime in the immediate radius of 5225 Wisconsin Avenue," including the crime in neighboring parking facilities, "made the criminal act in question clearly foreseeable," and that parking facilities, especially those left unsecured, are widely recognized to be "hot spots" for criminal activity.  (*Id.* at 20, 22.)  In combination, plaintiff contends, this evidence "effectively exhibit[s] that the crime at issue was reasonably foreseeable."  (*Id.* at 24.)

While a "special relationship" may exist at least as between plaintiff and Starwood, the commercial landlord of his employer, thereby making "less important" specific evidence of foreseeability, *Workman*, 320 F.3d at 264, to survive summary judgment plaintiff must nonetheless present sufficient probative evidence from which a reasonable juror may find that the defendants had "an increased awareness of the danger of [the] particular criminal act." *Workman*, 320 F.3d at 262 (quoting *Doe*, 524 A.2d at 33).  And while the D.C. Court of Appeals has found the foreseeability requirement to be met based on a plaintiff's special relationship with a defendant combined with a comparatively less precise showing of specific foreseeability evidence, a careful examination of these limited number of cases reveals that plaintiff has not met even the reduced foreseeability requirement as applied by D.C. courts.

For example, in *District of Columbia v. Doe*, the D.C. Court of Appeals upheld a jury verdict against the District after a fourth grade girl was abducted from her classroom at school and raped.  Finding that the crime was foreseeable based in part on the existence of a special relationship entailing a duty of protection -- the District's duty of custodial care for its schoolchildren -- the *Doe* court observed that:

> sufficient probative evidence was submitted to the jury in order for
> it to determine whether school officials were on notice of the
> danger to students from *assaultive criminal conduct by intruders*.
> This evidence included:  crimes against persons in and around the

-11-

> school -- an arson in the school and a robbery on the school's
> playground; sexual assaults and other violent activity in the
> surrounding area; and deficient school security -- the open rear
> gate, broken doors, malfunctioning intercom, and presence of adult
> males who freely roamed throughout the school. These factors
> could be viewed by reasonable factfinders as enhancing the
> foreseeability of danger from intruders, thereby creating a duty on
> the part of District officials to protect the students from this type of
> criminal activity.

524 A.2d at 33-34 (emphasis added); *see also Clement*, 634 A.2d at 429 (noting that "[i]mplicit in *Doe*'s holding was the notion that particular care is required by school officials when the safety of young children is involved"). Thus, even where the duty of protection stemming from a special relationship was at its strongest on the "sliding scale," *see Workman*, 320 F.3d at 263-64, the court required that the school officials be on notice of the *specific type of crime at issue* -- "assaultive criminal conduct by intruders." *Doe*, 524 A.2d at 33. In making its finding that the school was on notice, the court took note of an open rear gate and broken doors, *as well as* crimes against persons in and around the school, sexual assaults and violent activity in the surrounding area, and adult males who roamed the school. *Id.*; *see also Workman*, 320 F.3d at 263 (noting that under the circumstances presented in *Doe*, "it would seem only a matter of time until one of the District's charges was abducted or molested"). While the instant case, where the duty of protection owed a tenant by a commercial landlord is not as high as that owed to students by a school, does involve a broken door, the accompanying evidence of previous crime presented by plaintiff does not come close to the quantum of proof on which the *Doe* court relied.

Similarly, in *Doe v. Dominion Bank*, the plaintiff was raped on a vacant floor of her office building during business hours. Applying the "combination of factors" analysis, the D.C. Circuit reversed the district court's grant of a directed verdict in favor of the defendant landlord,

noting that the landlord-tenant relationship suggested a duty of protection, and holding that sufficient evidence was presented for the jury to determine whether the landlord was on notice "of the danger to tenants' employees from assaultive criminal conduct by intruders." 963 F.2d at 1562. Though there was no evidence of prior criminal assaults in the building, the evidence presented to the jury included:

> deficient building security -- unsecured vacant floors and offices, freely accessible via unlocked stairwells and unprogrammed elevators; criminal or unauthorized conduct within the building, including a burglary at the [office of another tenant], thefts of personal and office property, drug use, and sexual activity; and tenant complaints of threatening and aggressive intruders appearing in the building in the month immediately preceding the rape.

*Id.* In addition, the landlord had received letters from a tenant and the office manager expressing "grave concern for the safety of employees, not merely the security of property, prompted by the presence of disturbing strangers in the building . . . [due] to the lapses in building security." *Id.* While the D.C. Circuit chided the district court for insisting that plaintiff had to show the previous occurrence of crimes against a person, *id.* (calling the district court's approach "at odds with D.C.'s multi-factored, anti-talismanic approach to foreseeability"), the quantity and nature of the foreseeability evidence in *Dominion Bank* was similar to that presented in *Doe*. As the D.C. Circuit later observed of the *Dominion Bank* case, "another crime was just waiting to befall a tenant." *Workman*, 320 F.3d at 263. Most importantly, the evidence of sexual activity in the building's vacant areas and the presence of "threatening and aggressive intruders" was logically related to and predictive of the crime that actually occurred -- a rape by an intruder in one of the building's vacant areas. By contrast, there was no comparably predictive evidence of serious criminal activity or reports of suspicious intruders in the building or in the garage at 5225

Wisconsin in the months preceding this crime, and, significantly, there is no evidence that any tenant at 5225 Wisconsin complained to any defendant about lapsed security or about intruders in the building in the year leading up to the bombing. (C&P Facts ¶¶ 8, 16.)

Similarly, in *Graham v. M & J Corp.*, 424 A.2d 103 (D.C. 1980), which plaintiff calls "quite similar to the case at bar" (Pl. Opp. at 17), the D.C. Court of Appeals reversed the trial court's entry of summary judgment in favor of a landlord. Tenants and guests living in a two-family residential building sued the landlord for injuries resulting from a fire deliberately set in the hallway of the building by the former "paramour" of one tenant. *Id.* at 104. The day before the fire, the police were called to supervise the eviction of the arsonist, who never possessed a key to the building, after he had an argument with the tenant. *Id.* at 105. In holding that the plaintiff had presented sufficient evidence to raise a jury question as to foreseeability, the court noted that the tenants had "frequently complained to the landlord about the absence of an outer door lock" and "explained to the rental agent that intruders and strangers entered the foyer through the open door and committed acts of vandalism, such as removing the lights or fuses." *Id.* Moreover, one tenant had informed the rental agent of an attempted burglary through her window, and both parties acknowledged that the neighborhood was a "high in criminal activity." *Id.* at 105. The court held that this collection of evidence "create[d] a triable issue of fact as to whether the danger of a criminal assault by means of arson was sufficiently probable and predictable to create a duty in the landlord to take reasonable precautionary measures."[6] *Id.* at

---

[6] In *Spar v. Obwoya*, 369 A.2d 173 (D.C. 1977), another case on which plaintiff relies, the plaintiff was shot in the vestibule of his apartment building, which was located in a high crime neighborhood. There had been previous reports of an armed robbery in the building's stairwell and other crimes in the building's hallways, and the front door lock was broken. *Id.* at 175-76.

106. Again, in the instant case there is no comparable evidence of specific incidents of recent, similar crime in the building or recent complaints to the building management about building security such that the building management would have had "an increased awareness" of the danger of the "particular criminal act" that occurred. *See Doe*, 524 A.2d at 33. And unlike the arsonist in *Graham* who had been ejected from the property under police supervision the day before the fire, the presence of Prescott Sigmund at 5225 Wisconsin on July 10, 2002, would likely not have raised any suspicions because he visited the building frequently and had a key to his father's Blazer (*see* Prescott Sigmund Dep. at 12, 33, 48), and defendants were unaware of any need to exclude him from the building or the garage. *See Graham*, 424 A.2d at 106 (noting that a "jury could conclude that [the arsonist] was no longer a guest, and that the tenants had as much legitimate expectation to keep him off the premises as they would any other intruder").

Most recently, in *Novak v. Capital Management & Development Corp.*, 452 F.3d 902 (D.C. Cir. 2006), the D.C. Circuit interpreted the "sliding scale" analysis to allow a finding of foreseeability "when there is a 'special relationship' between the person injured by the crime and the defendant, and *prior, similar criminal acts* have occurred in the area where the plaintiff was hurt." *Id.* at 912 (citing *Workman*, 320 F.3d at 264) (emphasis added). In that case, the Court overturned the district court's grant of summary judgment in favor of defendant nightclub in a lawsuit arising out the brutal attack of two of the club's patrons immediately outside the club's entrance by a group of "thugs." *Id.* at 903. In finding that there was sufficient evidence to present the question of foreseeability to a jury, the Court recognized a "special relationship" between the club and the patrons giving rise to a duty of protection -- that of business invitor to business invitee. *Id.* at 913. Applying the reduced foreseeability burden for special

relationships, the Court found that there was sufficient evidence that the club had "an increased awareness of [the] *particular criminal act*" -- *i.e.* the attack outside the club -- because testimony from the club's employees indicated that fights occurred inside the club at least twice a month, and fights occurred in the alley outside the club where the plaintiffs were attacked once or twice a month. *Id.* at 913 (quoting *Doe*, 524 A.2d at 33) (internal quotation marks omitted) (emphasis added). In addition, there was evidence that just moments before the assault the club had ejected a group of patrons for fighting inside the club. *Id.* The Court found that this "significant" evidence, when combined with the special relationship, "certainly could put a reasonable club owner on heightened notice that a serious problem existed outside its door," and that its "violence problem was not 'sudden and unexpected.'" *Id.* at 914 (quoting *Kline v. 1500 Mass. Ave. Apartment Corp.*, 439 F.2d 477, 483 (D.C. Cir. 1970)). Again, the *Novak* Court did not require the plaintiff to show "previous occurrences of the particular type of harm," but plaintiffs did present evidence of previous fights or "fisticuffs" to establish the foreseeability of the severe beating they received. *Id.* at 912, 914 n.11 (quoting *Doe*, 524 A.2d at 33). And even applying the reduced evidentiary burden appropriate when there is a "special relationship," the Court's foreseeability calculus focused exclusively on evidence of prior, recent, "*similar* criminal acts" -- violent crime inside and outside the club. *See id.* at 912-14 (emphasis added). By contrast, the limited number of prior criminal acts at 5225 Wisconsin cannot reasonably be considered even remotely similar to the premeditated car-bombing that occurred there.

In sum, plaintiff's evidence of foreseeability simply does not approach the "combination of factors" shown in cases like *Doe*, *Dominion Bank*, *Graham* or *Novak*, and it is therefore insufficient to attribute "an increased awareness of the danger" of this "particular criminal act" to

these defendants. *Doe*, 524 A.2d at 33; *see Briggs v. WMATA*, No. 01-1876, 2006 WL 543991, at *4 (D.D.C. Mar. 6, 2006). By the standards of a large city like Washington, the evidence of crime at 5225 Wisconsin, even when combined with the surrounding neighborhood (as defined by the five-block radius), is not sufficient. In particular, the thirty-two various offenses reported at 5225 Wisconsin, including one armed robbery outside the building and three minor assaults (a kicking, a poking, and a "headbutting" with no serious injuries reported), over the five-year period preceding the bombing do not suggest the possibility of the "sudden and unexpected" violent crime that caused the plaintiff's injuries. *See Kline*, 439 F.2d at 483 (noting that no liability is normally imposed on a landlord for a criminal act on his property when "the violence is sudden and unexpected"). And plaintiff's evidence of 503 crimes occurring within the five-block radius surrounding the building in the two years leading up to the bombing adds little to plaintiff's effort to show foreseeability. (Ortenzo Aff. ¶ 51.) This type of "generic" evidence alone is insufficient under D.C. law to show that defendants had an increased awareness of a danger at 5225 Wisconsin, *see Bailey*, 668 A.2d at 820, and it is simply not enough to show foreseeability in this case, where the building itself had such a sparse record of prior similar crimes.

Given the relatively safe environment, and in particular the fact that there were only five crimes at the garage in over six years and none of them occurred in the almost nine-month period before the incident in question, defendants could not reasonably have expected that their failure to repair the garage door in a more timely manner would lead to a horrific and premeditated bombing, executed by a family member with the intent to kill one of the building's tenants. To say that the bombing of plaintiff's father's car by his half brother using a homemade pipe bomb

-17-

with the goal of collecting an inheritance to pay off debt was "highly extraordinary in retrospect" would be an understatement. *See Morgan*, 468 A.2d at 1318.

This conclusion is buttressed by court decisions in other jurisdictions that have confronted comparable situations. *See, e.g.*, *Faheen v. City Parking Corp.*, 734 S.W.2d 270 (Mo. Ct. App.1987) (holding that parking garage owners had no duty to protect a tenant against a car bombing in the garage because prior crimes in the vicinity -- which included arson, robbery, assault and burglary -- were not of the type to place the owners on notice of the criminal activity at issue); *Lopez v. McDonald's*, 238 Cal. Rptr. 436, 445 (Cal. Ct. App. 1987) (holding that a mass murder of twenty-one people in a McDonald's restaurant by a deranged shooter was unforeseeable as a matter of law, and noting that such a crime was "so unlikely to occur within the setting of modern life that a reasonably prudent business enterprise would not consider its occurrence in attempting to satisfy its general obligation to protect business invitees from reasonably foreseeable conduct").

While the broken door on the parking garage at 5225 Wisconsin undoubtedly made it somewhat more foreseeable that crime in general would occur in the garage, it does not make up for the total lack of evidence of recent crime at the location in question that would have given defendants increased awareness that someone would be the victim of an attempted homicide there. The plaintiff's opposition highlights Prescott Sigmund's testimony that the broken garage door presented him with the "the opportunity . . . [he] had been looking for" to plant a bomb in his father's car. (Prescott Sigmund Dep. at 12; *see* Pl. Opp. at 5 ("[The broken garage door] presented Defendant Prescott with the opportunity to commit the crime, *and at this point*, . . . he finally decided to commit the crime and plant the explosives in his father's car." (emphasis in

original)).) Arguments about whether Prescott would have executed his plan had the garage door not been broken are relevant to whether the defendants' alleged negligence was the proximate cause of plaintiff's injuries, not to whether the bombing was reasonably foreseeable. Plaintiff does not present any evidence, for example, that there were more intruders spotted in the garage or in the rest of the building during the time that the door was stuck in the up position. In fact, no crime was reported at the building during this time. (C&P Facts ¶ 26.) Furthermore, the fact that the garage was ordinarily readily accessible through the restaurant and the lobby undercuts plaintiff's argument that the broken garage door made the bombing more foreseeable. Given that relatively easy public access to the garage was the status quo, the fact that the garage door was stuck in an open position made increased crime in the garage only marginally more foreseeable than it otherwise would have been. And while inadequately secured doors were at issue in *Doe*, *Dominion Bank*, and *Graham*, those cases, unlike this one, all also involved substantial evidence of prior criminal activity at the very location involved, high crime in the surrounding neighborhood, and/or prior complaints to the landlord about intruders and inadequate building security.

Therefore, the Court finds that the plaintiff has failed as a matter of law to meet his burden of producing evidence of the heightened level of foreseeability required by D.C. courts to impose liability on the defendants for the criminal acts of a third party. *See Briggs*, 2006 WL 543991, at *4; *Workman*, 320 F.3d at 264 ("[P]laintiff's evidence of foreseeability must be particularly strong to survive summary judgment.").

## CONCLUSION

Because plaintiff has not produced sufficient evidence of a "combination of factors" that

gave the defendants an "increased awareness of [the] particular criminal act" at issue, *Doe*, 524 A.2d at 33, he has failed to meet the heightened level of foreseeability required to survive summary judgment. Accordingly, defendants' Motions for Summary Judgement are granted, and the plaintiff's claims against them are dismissed with prejudice. Because the Court's finding that the bombing was unforeseeable as a matter of law fully resolves the question of liability in this case, all other pending claims, including counter-claims, cross-claims and third-party claims, are dismissed as moot. A separate Order accompanies this Memorandum Opinion.

/s/
ELLEN SEGAL HUVELLE
United States District Judge

February 28, 2007